UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KYUNG HYE YANO, individually and as Guardian/Parent/Next Friend of S.Y., a Minor<br><br>Plaintiff,<br><br>v.<br><br>CITY COLLEGES OF CHICAGO, et al.<br><br>Defendant. | No. 08 CV 4492<br>Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

Kyung Hye Yano, individually and on behalf of her minor child, S.Y., sued City Colleges of Chicago, Truman College, Mohamed El-Maazawi, Priscilla Lancki, Elia Lopez, Elizabeth Roeger, Lynn M. Walker, Pervez Rahman, Chancellor Wayne Watson, Rudra V. Dundzila, and John/Jane Does. Claims were brought under Title IX, Title VI, 42 U.S.C. § 1983 and Illinois common law, alleging that Yano and S.Y. were victims of discriminatory, retaliatory and tortious conduct while S.Y. was a student at Truman College in Chicago, Illinois. The complaint was filed on August 8, 2008. On June 4, 2012, Defendants moved for summary judgment on all counts. The motion is fully briefed before this Court.

For the following reasons, Defendants' motion for summary judgment is DENIED in part and GRANTED in part.

**I.      BACKGROUND**

S.Y., born on June 19, 1996, is a female of Korean descent who entered Truman College in 2006 after graduating from high school at the age of nine. Kyung Hye Yano ("Yano") is

S.Y.'s mother. During her time at Truman, S.Y. received an "A" in all of her courses and received three recommendations from Truman professors. She was inducted into Phi Theta Kappa, an honors society, and awarded two merit scholarships. Despite these accomplishments, S.Y. ran into problems with various faculty members and students that eventually led her to withdraw from the college three classes short of an Associate's degree.

This case concerns alleged harassment and discriminatory conduct by Truman professors and administrators directed against S.Y., and later against Plaintiff when she attempted to intervene on her daughter's behalf. The complained of conduct primarily arose out of three of S.Y's courses: Spanish 101, taught by professor Elia Lopez ("Lopez"), Biology 121, taught by Professor Priscilla Lancki ("Lancki"), and Chemistry 201, taught by Dr. Mohamed El-Maazawi ("El-Maazawi").

### A. Spanish 101

In the Spring 2007 semester, S.Y. enrolled in Spanish 101. Professor Lopez gave S.Y. a "B" on her Spanish midterm report despite her grade performance meriting an "A." While the parties disagree as to whether the midterm grade is a factor in the final grade, S.Y. in fact ended up receiving an "A" as her final Spanish 101 grade. S.Y.'s faculty advisor, Tina Igbinosa ("Igbinosa"), took S.Y. to meet with Truman College's Vice President Pervez Rahman ("Rahman") to lodge a complaint regarding Lopez's mid-term grading techniques. Rahman then spoke with Lopez about the complaint. After this incident, Lopez made in-class comments to S.Y. about her volume and pronunciation. Plaintiff claims S.Y. was "picked on" and "scolded" by Lopez.

### B. Biology 121

S.Y. enrolled in Biology 121, with Professor Lancki, in the Summer 2007 term. S.Y's second quiz was handed back with a failing grade, but S.Y. noticed her Quiz II scantron had erasure marks and her Quiz II test booklet contained drawings that belonged to someone else. The Biology department chair, Yvonne Harris ("Harris") examined S.Y.'s Quiz II scantron and test booklet and noted "oddities" or "places where the scantron had been erased and did not match up with the test booklet." On June 28, 2007, Yano emailed Lancki regarding the matter and sent a copy of her email to the Dean of Instruction Elizabeth Roeger ("Roeger"), who forwarded the message to Rahman and Harris.[1]

After concerns about test tampering were raised, Lancki frequently singled out S.Y. in front of her classmates, accused her of cheating and regularly referred to her as the "little girl." Lancki also joked to the class, "this is not a grade school," in reference to S.Y. At times, Lancki talked about how the "little girl [] received an A on the first quiz but flunked the second one, and [is now] claiming that it was switched." In addition to these comments, several times Lancki accused S.Y. of slandering her. On one occasion, Lancki stared at S.Y. and S.Y. felt afraid. After these remarks were made by Lancki, S.Y.'s lab group stopped sitting with her or talking to her.

On July 3, 2007, while S.Y. was taking Quiz III in Lancki's class, Roeger allegedly sat behind S.Y. and loudly slurped a soda in a disruptive way. During the test, Yano was waiting in another room for S.Y. to finish. At some point, Roeger, accompanied by two women, approached Yano and threatened to remove her from the building. In referring to the above course of events, Roeger stated, "the saga goes on." Roeger also forwarded confidential emails received from Yano and from Dr. Dundzila to her then boyfriend (now husband) Terry Ludwig.

---

[1] Harris maintained the original Scantron for Quiz II until she left Truman in August 2008. After this point, it is unclear what happened to the Quiz II Scantron. Defendants were unable to produce it during discovery, claiming that it had been lost. Plaintiff believes there has never been an adequate investigation into potential tampering with S.Y.'s Quiz II Scantron.

On July 19, 2007, Lancki told the class she was in trouble because someone was slandering her, and requested that students write or lodge complaints on her behalf. Immediately after this incident, two students approached Yano and S.Y. in a threatening manner and followed them as they attempted to flee. Dr. Xingwu Wang ("Wang"), S.Y.'s professor-mentor, separated the students from S.Y. and Yano, and sat by S.Y. for the remainder of her classes that day.

Throughout this time, Yano sent regular updates, regarding Lancki's conduct, to Roeger, Rahman, Truman Interim President Lynn Walker ("Walker"), and Chicago City Colleges Chancellor Wayne Watson ("Watson"). After the incident on July 19, the administration initiated a formal investigation of Lancki's conduct and ultimately suspended her for making inappropriate comments to and about S.Y. and for violating City Colleges of Chicago work rules 24 (insubordination), 31 (treating discourteously any member of the public), 34 (acting negligently or willfully in the course of employment), and 50 (conduct unbecoming a public employee). For the remainder of S.Y.'s time at Truman, when Lancki would pass S.Y. in the hallways, Lancki would point toward S.Y. and say, "that's her," to whomever Lancki was with.

### C. Chemistry 201

In the Spring 2008 term, S.Y. enrolled in Chemistry 201 with Dr. El-Maazawi. Early in the semester, Plaintiff and S.Y. raised concerns with regard to lab safety. Specifically, Plaintiff was concerned that El-Maazawi was having students handle chemicals without adequate protection and supervision.

When safety concerns were raised to Roeger, she responded by attempting to withdraw S.Y. from Chemistry 201 despite S.Y.'s desire, at the time, to stay enrolled. These concerns were also raised directly with Walker, whom only tried to assure Yano and S.Y. of the low

4

concentrations of the classroom chemicals. Plaintiff contends the actual concentrations were 600 times greater than what Walker claimed.

After concerns were raised with the administration, El-Maazawi refused to give S.Y. and her partner gloves on one occasion, failed to answer S.Y.'s questions immediately, sometimes yelled at S.Y. for asking questions and followed her around campus on four different occasions. S.Y. felt humiliated by and afraid of El-Maazawi for the remainder of her time in Chemistry 201.

Also, while S.Y. was enrolled in El-Maazawi's class, one of S.Y.'s quizzes was misplaced. Plaintiff's brief alleges El-Maazawi failed to adjust S.Y.'s scores on the curve that was applied to the rest of the class, posted failing grades under S.Y.'s name on the blackboard system and instituted a new test-hand-back procedure requiring all students to stand and orally confirm they received their test before sitting to further stigmatize S.Y.. Plaintiff, however, has produced no evidence to support these allegations.

While S.Y. was enrolled in Lopez's, Lancki's, and El-Mazaawi's classes, Yano sent several emails to Chancellor Wayne Watson to inform him of concerns related to each of the above incidents. Watson sometimes failed to follow up with Yano or address Yano's concerns with President Lynn M. Walker.

### D. Dr. Dundzila's email

During the Fall 2007 semester, Dr. Rudra V. Dundzila ("Dundzila"), a humanities professor, wrote an email to Roeger to lodge a complaint regarding S.Y.'s enrollment in his class (unbeknownst to Dundzila, S.Y. had already withdrawn from his humanities course). Dundzila's email expressed concern that certain content in his course was "R-rated" and potentially inappropriate for a student of S.Y.'s age. The email also stated S.Y. was "a problem in class"; "anti-social"; "does very poorly in groups"; and is "NOT the gifted child her mother claims her

5

to be." As to Yano, he said: "The administration has refused to allow security to remove this trouble maker, or have her arrested for the repeat instances of her disruptive behavior"; "Bar the mother from class. If she disrupts the class, as she has repeatedly done in the past, have her arrested and prosecuted"; "Several faculties have reported the mother is emotionally abusing the child… this needs to be reported to the state for an independent investigation."

After S.Y.'s experiences at Truman College, S.Y. and Yano were placed on treatment plans for depression, anxiety and losing weight without dieting.[2] S.Y. was diagnosed as having a "difficult time trusting adults," "tremendous fear and feeling lack of safety," "increasing feelings of anxiety, depression and sadness," and "increasing fear, nightmares and migraines."

## II. STANDARD OF REVIEW

Summary judgment is proper if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir. 1988).

The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This Court must then determine whether there are any genuine factual issues that can properly be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson*, 477 U.S. at 249; *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 931 (7th

---

[2] Defendants object to ¶ 88 of Plaintiff's Statement of Facts as inadmissible hearsay. But Licensed Clinical Professional Counselor (LCPC) Asako Hoichi's treatment report is a statement made for medical diagnosis or treatment and qualifies as an exception to the rule against hearsay. FED. R. EVIDENCE 803(4).

Cir. 1995). Where a party bears the burden of proof on an issue, she must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact requiring trial. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

Plaintiff has brought a Title IX Gender Discrimination claim (Count I) and a Title VI National Origin Discrimination claim (Count II) against City Colleges of Chicago and Truman College, and a § 1983 class-of-one claim (Count III) and retaliation claim (Count IV) against all Defendants. Plaintiff also brings several state law causes of action: assault (Count V) against Mr. Hose and Roeger's unnamed assistants, defamation *per se* (Count VI) against Dundzila, defamation *per quod* (Count VIII) against Dundzila, and Intentional Infliction of Emotional Distress (Count X) against all Defendants.

Count V, the assault claim against Mr. Hose and Roeger's unnamed assistants, was voluntarily dismissed by Plaintiff, (Pl.'s Br. at 46), and is dismissed accordingly by this Court. The remaining claims will be addressed in turn.

### A. Count I: Gender Discrimination based on Title IX

To establish a Title IX prima facie case, S.Y. must show gender-based discrimination so severe as to effectively "deprive [her] of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe Cty Bd. of Educ.*, 526 U.S. 629, 650 (1999); *accord*

7

*Lucero v. Nettle Creek School Corp.*, 566 F.3d 720, 731 (7th Cir. 2009) (citations omitted). "[I]nappropriate conduct that is inflicted regardless of sex," is not unlawful discrimination. *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000).

Defendants argues that Plaintiff has presented no evidence that S.Y. was denied benefits of any educational program. Moreover, Defendants assert, even if there was exclusion from participation in an educational program, Plaintiff has failed to proffer evidence suggesting the exclusion occurred because of an existing gender bias. I agree Plaintiff has failed to present evidence of gender-related discrimination. Even if Plaintiff's allegations of gender bias were granted, such discrimination cannot be imputed on the institution to establish S.Y.'s Title IX claim.

The only evidence Plaintiff has proffered implicating gender are the incidents where teachers referred to S.Y. as the "little girl." Even if this statement was made out of a gender bias, it reflects the bias of the institution's employees, not the institution itself. By asking the Court to impute the bias of certain employees to the institution itself, Plaintiff requests I read a form of agency liability into Title IX. But this Circuit has held, "Title IX lacks any statutory basis for applying agency principles." *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1024 (7th Cir. 1997). Title IX defines "program or activity" to include only those who have administrative control of the school. *Id.* A teacher has no such control. *See id.* Therefore, even if S.Y.'s teachers discriminated against S.Y. on the basis of gender, this is inadequate to establish Plaintiff's Title IX claim and summary judgment is accordingly granted.

### B. Count II: National Origin and Gender Discrimination under Title VI

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be

8

subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To prove discrimination under Title VI, Plaintiff must establish S.Y.: (1) is a member of a protected class; (2) was meeting the school's legitimate educational expectations; (3) suffered an adverse educational action; and (4) was treated worse than similarly situated students not in the protected class. *Brewer v. Board of Trustees of the University of Illinois*, 479 F.3d 908, 921 (7th Cir. 2007). Plaintiff failed to establish the fourth element of her Title VI claim because she has not presented any evidence of race or national-origin-based discrimination.

To avoid summary judgment, Plaintiff must present evidence sufficient to permit a reasonable jury to conclude that the College took adverse actions for race or national origin-based reasons. *See id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)). A jury could find no such reasons here. Plaintiff only alleges "it is very clear that S.Y. was treated worse than the non-Asian students in her classes." This allegation, without corroborating evidence in the record, is insufficient to defeat summary judgment. A party bearing the burden of proof at trial is required to "go beyond the pleadings and affirmatively establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). Summary judgment is granted with respect to Count II.

    **C.**    **Counts VI and VIII: Defamation *per se* and Defamation *per quod***

To prove defamation, Plaintiff must show: (1) a defendant made a false statement concerning the plaintiff; (2) there was an unprivileged publication of the defamatory statement to a third party by the defendant; and (3) plaintiff was damaged. *Wynne v. Loyola Univ. of Chicago*, 741 N.E.2d 669, 675 (Ill. App. Ct. 2000).

Statements can be either defamatory *per quod* (requiring extrinsic facts to explain the defamatory character of the statements) or defamatory *per se* (obviously and naturally harmful to

a person). *Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201, 206 (Ill. 1992). Four categories of statements are considered defamatory *per se*: (1) words that impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office of employment; and (4) words that prejudice a party, or impute a lack of ability, in his or her trade, profession, or business. *Bryson v. News America Publications, Inc.*, 672 N.E.2d 1207, 1214–15 (Ill. 1996).

Plaintiff's defamation claims rest entirely upon the email sent by Dr. Dundzila to Roeger. Dr. Dundzila stated S.Y. was "a problem in class"; "anti-social"; "does very poorly in groups"; and is "NOT the gifted child her mother claims her to be." As to Yano, he said: "The administration has refused to allow security to remove this trouble maker, or have her arrested for the repeat instances of her disruptive behavior"; "Bar the mother from class. If she disrupts the class, as she has repeatedly done in the past, have her arrested and prosecuted"; "Several faculties have reported the mother is emotionally abusing the child… this needs to be reported to the state for an independent investigation."

Plaintiff relies on defamation *per se* to establish as actionable statements made regarding S.Y.'s performance as a student. This argument fails. As a full-time student, S.Y. was by definition not engaged in a trade, profession, or business. Plaintiff point to no case in which a comment regarding a college student's scholastic performance was treated as defamation *per se*, and I decline to be the first to extend the law in this dubious manner.

Plaintiff argues that remarks made against Yano are actionable as defamation *per se* and *per quod*. First, Plaintiff argues Dr. Dundzila's statements against her imputed the commission of a criminal offense by asserting that Yano abuses S.Y., and should be considered defamatory

10

*per se*. In determining whether a statement constitutes defamation *per se* as imputing the commission of a crime, the words must be taken in the sense that readers, of common and reasonable understanding, would ascribe to them and must be construed in the context of the entire communication. *Lorillard v. Field Enterprises, Inc.* 213 N.E.2d 1, 4 (Ill. App. Ct. 1965). For words imputing the commission of a crime to be defamation *per se*, the offense must be indictable, involve moral turpitude and be punishable by imprisonment rather than by a fine. *Id.*

The accusations of emotional child abuse do not impute the commission of a crime punishable by imprisonment. Illinois law does not explicitly prohibit emotional abuse, but only the infliction of physical injury, creation of a risk of physical injury, commission of sexual offenses, distribution of a controlled substance, or the placing of a child in involuntary servitude. 325 ILCS 5/3 (a)–(h). Further, a reasonable understanding of the statement, in the context of the email, is not to impute an indictable offense. For example, in *Newell v. Field Enterprises, Inc.*, an article stating a plaintiff was being sued for wrongful death was not defamation *per se*, because a reasonable understanding of the statement suggested the plaintiff was being sued in civil court as opposed to being on trial in criminal court. 415 N.E.2d 434, 441–42 (Ill. App. Ct. 1980). Likewise, the reasonable interpretation of Dr. Dundzila's statements, at worse, place Yano in the position of having to answer to the Department of Child and Family Services, but not in the position of defending herself in criminal court.

The remaining statement made against Yano that Plaintiff argues is defamatory *per se*—that Plaintiff should be "arrested and prosecuted" if she disrupts future classes—I deem to be rhetorical hyperbole, which is not actionable. *See Hopewell v. Vitullo*, 701 N.E.2d 99, 103–04 (Ill. App. Ct. 1998); *Haberstroh v. Crain Publications*, 545 N.E.2d 295, 298–99 (Ill. App. Ct. 1989).

Yano's defamation *per quod* claim also does not withstand summary judgment. A defamatory statement that is actionable *per quod* must be accompanied by an allegation that the plaintiff suffered special damages. *Kurczaba v. Pollock*, 742 N.E.2d 425, 433 (Ill. App. Ct. 2000). Special damages are damages to the plaintiff's reputation and pecuniary losses resulting from the defamatory statement. *Id.* at 434. "[G]eneral allegations such as damage to one's health or reputation, economic loss, and emotional distress are insufficient to state a cause of action for defamation per quod." *Id.*

There is insufficient evidence of special damages in the record to raise a genuine issue of material fact on this point. In *Kurczaba*, the plaintiffs alleged generally that as a result of defamatory statements made by the defendants, the plaintiffs suffered damage to their reputations, loss of business income, great embarrassment, public humiliation, mental anguish and emotional distress. 742 N.E.2d at 433. The court concluded the allegations lacked sufficient specificity to support their claim for defamation *per quod*. *Id.* at 434. Similarly, Yano asserts damages in the form of lower book sales in South Korea, China, Japan and Taiwan, but fails to establish with any specificity how statements made within the Truman faculty and administration could possibly affect overseas book sales.

Dr. Dunzila is granted summary judgment with respect to all defamation claims.

### D.     Count X: Intentional Infliction of Emotional Distress

Finally, I consider whether summary judgment is appropriate on Plaintiff's intentional infliction of emotional distress claim. To prove this claim under Illinois law, Plaintiff must show that (1) the Defendants' conduct was extreme and outrageous; (2) the Defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the

conduct in fact caused severe emotional distress. *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992).

Demonstrating "extreme and outrageous conduct" is a difficult bar to meet: "[m]ere insults, indignities, threats, annoyances, petty oppressions or trivialities" are not actionable as intentional infliction of emotional distress. *Oates v. Discovery Zone*, 116 F.3d 1161, 1174 (7th Cir. 1997) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). The Defendant's conduct must be such that the "recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997).

Plaintiff relies on two sets of facts to establish extreme and outrageous conduct directed against her: she was forced to witness discriminatory acts by Truman faculty against S.Y. and she was tailgated by Mr. Hose, an alleged accomplice of El-Maazawi. These claims fall short. The connection between Mr. Hose and El-Maazawi is, on this record, too speculative to sustain the claim against El-Maazawi. Further, Plaintiff did not directly witness most of the alleged conduct against S.Y., and that which she did directly witness was not severe enough to rise to the level of extreme and outrageous. Viewing all facts in the light most favorable to Plaintiff, a reasonable jury could not find any of the alleged acts that occurred in Plaintiff's presence to be "beyond all possible bounds of decency." *Swearnigen–El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 864 (7th Cir. 2010).

Next, Plaintiff argues that the actions of Lancki, El-Maazawi and Roeger constituted extreme and outrageous conduct against S.Y. These actions included calling S.Y. a cheater after she made allegations of test-tampering (Lancki), losing the tampered-with scantron sheet (Lancki and Roeger), attempting to remove S.Y. from classes under the pretext of safety (Roeger), and

following S.Y. around campus (El-Maazawi). (Doc. 130, at 36.) Plaintiff argues that even if the above conduct does not qualify as extreme and outrageous standing alone, it should be considered so in light of the authority that the Defendant's exercised over S.Y. as a student and S.Y.'s particular susceptibility to emotional distress given her young age. *See Franciski v. University of Chicago Hospitals*, 338 F.3d 765, 769 (7th Cir. 2003); *McGrath*, 533 N.E.2d at 810 ("The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous . . .").

No reasonable jury could find that the Roeger's alleged conduct—disrupting S.Y.'s test taking by loudly sipping a soda, and removing S.Y. from a class under pretext—constituted extreme and outrageous conduct. They were mild, isolated incidents that could not possibly have inflicted distress "so severe that no reasonable person [including an eleven year-old] could be expected to endure it." *See Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976).

However, viewing all facts in the light most favorable to Plaintiff, a reasonable jury could find that El-Maazawi and Lancki's actions did rise to the level of extreme and outrageous conduct. First, there is evidence that both Defendants subjected S.Y. to a continuous course of illegitimate harassment. *See Pavlik v. Kornhaber*, 761 N.E.2d 175, 187 (Ill. App. Ct. 2001) (citing RESTATEMENT (SECOND) OF TORTS § 46, comment j (1965)). ("It may be the pattern, course and accumulation of acts that make the conduct sufficiently extreme to be actionable, whereas one instance of such behavior might not be."). There is evidence in the record that El-Maazawi repeatedly followed S.Y. around campus in a manner that could reasonably be described as stalking. Similarly, there is deposition testimony that Lancki made insulting comments toward S.Y. in front of her class throughout the summer of 2007, and this is

14

corroborated by the fact the Lancki was disciplined by Truman College for inappropriate comments directed at S.Y..

Second, as her instructors, both Lancki and El-Maazawi exercised a significant degree of authority over S.Y. There is evidence that both Defendants used this authority in abusive and illegitimate ways to humiliate, isolate, frighten, and potentially endanger S.Y.. Lancki's publicly naming S.Y. a "cheater," possible tampering with the Quiz II Scantron[3], and attempts to turn the class against S.Y.; El-Maazawi's refusal to provide S.Y. gloves to handle corrosive chemicals and efforts to single her out in front of the class (Pl. SOF ¶ 82)—all of this a reasonable jury could find to be the type of extreme abuse of position actionable under an IIED claim. RESTATEMENT (SECOND) OF TORTS § 46, comment *e*, at 74 (1965).

Any reasonable person in Defendants' position would realize the high probability of severe emotional harm that their actions could inflict on an eleven-year-old child. Finally, there is adequate evidence that Defendants' conduct did in fact cause emotional harm to S.Y. (Pl. SOF ¶ 88). The IIED claims against El-Maazawi and Lancki are going to a jury; the remaining Defendants are granted summary judgment with respect to Count X.

### E. Counts III and IV: Section 1983 Claims

It is unclear why the parties did not brief the issue of qualified immunity with respect to Counts III and IV. I want to see written argument on this before ruling on Defendant's motion for summary judgment on these claims. *See Buckley v. Fitzsimmons*, 20 F.3d 789, 793 (7th Cir. 1994) ("Although qualified immunity is an affirmative defense, no principle forbids a court to notice that such a defense exists, is bound to be raised, and is certain to succeed when raised."). The parties are to confer upon a briefing schedule and submit it to the Court.

---

[3] I find Defendants' inability to produce the Quiz II Scantron to be extremely suspicious. I will hear argument on the appropriateness of a spoliation instruction if and when the time comes; at this point, I am inclined to give one.

## IV. CONCLUSION

Based on the foregoing analysis, Defendants' Motion for Summary Judgment is GRANTED with respect to Counts I, II, VI, and VIII. Defendant Lancki and El-Maazawi's Motion for Summary Judgment is DENIED with respect to Count X. The remaining Defendants' Motion for Summary Judgment is GRANTED with respect to Count X. Further briefing is ordered on Counts III and IV.

ENTER:

*[signature: James B. Zagel]*

James B. Zagel
United States District Judge

DATE: March 6, 2013